# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| Vern **Lei**, *and* <br> Ross **Gilson**, <br><br> *Plaintiff(s);* <br><br> *vs.* <br><br> City of **Philadelphia**, <br><br> *Defendant.* | *No.* 24-cv-02716 |

## ORDER TO SHOW CAUSE
## FOR PRELIMINARY INJUNCTION AND
## TEMPORARY RESTRAINING ORDER

**AND NOW**, this _____ day of _____, 2024, upon consideration of the Plaintiff's Motion for Preliminary Injunction and Temporary Restraining Order and accompanying Memorandum of Law, and the Plaintiff's's Verified Complaint (ECF # 1), it is **ORDERED** that the Defendant City of Philadelphia show cause before this Court, at Courtroom # 7-B, 601 Market Street, Philadelphia, PA 19106, on _____ 2024, at _____ a.m./p.m. or as soon thereafter as counsel may be heard, why an order should not be issued pursuant to Rule 65 of the Federal Rules

of Civil Procedure enjoining Defendant City of Philadelphia during the pendency of this action from enforcing the Philadelphia Code § 10-2002 (5) (prohibiting 'Rate-of-fire acceleration device[s]').

It is **FURTHER ORDERED** that, sufficient reason having been shown pending the hearing of the plaintiff's application for a preliminary injunction, but in no event beyond 14 days from the entry of this order, unless otherwise extended by the Court, the Defendant City of Philadelphia is **TEMPORARILY RESTRAINED** and **ENJOINED** from enforcing the Philadelphia Code § 10-2002 (5).

It is **FURTHER ORDERED** that no security need be posted.


**BY THE COURT:**


_____

Hon. Anita B.Brody, J.

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Vern **Lei**, *and*<br>Ross **Gilson**,<br><br>*Plaintiff(s);*<br><br>*vs.*<br><br>City of **Philadelphia**,<br><br>*Defendant.* | *No.* 24-cv-02716 |

# [PROPOSED] ORDER

   **AND NOW**, this _____ day of _____, 2024, upon consideration of the Plaintiff's Motion for Preliminary Injunction and Temporary Restraining Order, it is **ORDERED** that:

1.  This Court finds that: (a) Plaintiffs are likely to prevail on the merits of their challenge to Philadelphia Code § 10-2002 (5); (b) Plaintiffs will suffer irreparable injury absent injunctive relief; and (c) the balance of all factors relevant to the grant of an injunction weighs in favor of Plaintiffs.

2.  Defendant City of Philadelphia is hereby **ENJOINED** from taking any action to enforce § 10-2002 (5) of The Philadelphia Code during the pendency of this action.

3.  No security is required of Plaintiffs because Defendant City of Philadel-
    phia will suffer no costs or damages from this injunction.


**BY THE COURT:**


_____

Hon.  Anita B.Brody, J.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Vern **Lei**, *and* <br> Ross **Gilson**, <br><br> *Plaintiff(s);* <br><br> *vs.* <br><br> City of **Philadelphia**, <br><br> *Defendant.* | *No.* 24-cv-02716 |

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

Plaintiffs Vern Lei and Ross Gilson respectfully move this Court to enter a Temporary Restraining Order and Preliminary Injunction pursuant to Federal Rules of Civil Procedure against the Defendant City of Philadelphia enjoining the City from enforcement of Philadelphia Code § 10-2002 (5) (prohibiting 'Rate-of-fire acceleration device[s]').

Defendants were provided a courtesy copy of the Verified Complaint via email Friday, June 21st 2024 at 10:42 a.m. to the Philadelphia City Solicitor, Renee Garcia, and Chief Deputy City Solicitor Lydia Furst and Deputy City

Solicitor Ryan Smith, two attorneys of the Affirmative & Special Litigation Unit.  Service of the issued Summons and Verified Complaint was accomplished on Friday, June 21st 2024 at/about 2:21 p.m.

Counsel were notified via email of Plaintiffs' counsels intended to file this Motion for Preliminary Injunction and Temporary Restraining Order via email on Friday, June 21st 2024 at 2:27 p.m.  Shortly thereafter, the City Solicitor advised the City intends to contest this motion.

Respectfully Submitted,

**Andrew B. Austin**, Esq.
Pennsylvania Bar # 323768
P.O. Box # 54628
Philadelphia, Pennsylvania, 19148
+1 (610) 656-1956
austin@replev.in

**AUERBACH PLLC**
Daniel J. Auerbach (I.D. No. 316856)
241 South 6th Street, # 1902B
Philadelphia, PA 19106
(215) 983-6966
dan@auerbach.llc

*Attorneys for Plaintiffs*

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Vern **Lei**, *and*<br>Ross **Gilson**,<br><br>*Plaintiff(s);*<br><br>*vs.*<br><br>City of **Philadelphia**,<br><br>*Defendant.* | *No.* 24-cv-02716 |

## PLAINTIFFS' PRELIMINARY INJUNCTION BRIEF

The Courts could not have been more clear: The City of Philadelphia ("City") has been repeatedly told it does not have the power to regulate possession of firearms. Pennsylvania Courts have repeatedly admonished it so, yet the City continues to—as the Commonwealth Court described—"ignore the [court's] precedential authority [] as if it does not exist." *City of Philadelphia v. Armstrong*, 271 A.3d 555, 568 (Pa. Commw. Ct. 2022).

Now, the City of Philadelphia is *again* attempting to illegally regulate firearms in violation of the firearms preemption provision of Pennsylvania's Uniform Firearms Act, 18 PA. CONS. STAT. § 6120 (a), and in contravention of both the United States and Pennsylvania Constitutions. *See* U.S. CONST. amend. II, PA. CONST. art. I, § 21.

Plaintiffs seek a temporary restraining order and preliminary injunction against this latest chapter in the City's illegal and unconstitutional gun regulations. Plaintiffs respectfully request this Court enter the proposed injunction as soon as possible.

## FACTS

On Tuesday, June 18th 2024, City of Philadelphia Mayor Cherelle Parked signed Bill 240472 ('Bump Stock Ban'), which amended the Philadelphia Code Chapter 10-2000 to prohibit the manufacture and possession of 'Rate-of-fire acceleration device[s]' within the City. Verified Complaint at ¶¶ 7–9. The amended Code defines 'Rate-of-fire acceleration device' ("ROF Device") as "A device, such as an auto sear or bump stock, that is designed to accelerate the rate of fire of a semi-automatic firearm." *Id*. at ¶ 8.

The Code provides for civil penalties of up to $ 2,000 per violation, and for repeat violations may include criminal penalties of up to 90 days imprisonment. *Id*. at ¶ 10. However, the Bump Stock Ban permits the City to 'stack' offenses, meaning that a person may be charged with multiple repeat violations along with their first violation, if they are first discovered with multiple regulated items. *Id*.

2

Plaintiff Vern Lei purchased a 'bump stock' online on June 14th 2024, prior to the enactment of the Bump Stock Ban, which will be delivered to him imminently. *Id*. at ¶ 14. Plaintiff Ross Gilson lawfully owns a lower receiver with auto-sear, in accordance with the requirements of the National Firearms Act ("NFA"). *Id*. at ¶ 15. Both Plaintiffs possess other items—not enumerated by the Bump Stock Ban—which theoretically could be construed to be prohibited ROF Devices. *Id*. at ¶ 16. However, neither Plaintiff knows if any or all of those devices might actually be prohibited by the Bump Stock Ban. *Id*. Irrespective of the Bump Stock Ban, plaintiffs do not wish to dispossess themselves of these lawfully possessed items. *Id*. at ¶ 17.

## LEGAL STANDARD

The standard for preliminary injunction and temporary restraining order in the Third Circuit is a two-step test. First, the movant "must meet the threshold for the first two "most critical" factors: it must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief" and once demonstrated, the Court "then considers the remaining two factors [harm to the parties and the public interest] and determines

in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) (footnotes omitted).

"[T]he burdens at the preliminary injunction stage track the burdens at trial". *Id*. (quoting *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 418 (2006)) (quotation marks omitted).  In the context of the Second Amendment, it is the government's burden to "demonstrate that [its] regulation is consistent with this Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Assoc., Inc. v. Bruen*, 597 U.S. 1, 17 (2022).

4

# ARGUMENT

## *Merits*

1.  ## THE CITY CONTINUES TO WILLFULLY FLAUNT THE COURTS BY REPEATEDLY PASSING LAWS SUCH AS THE BUMP STOCK BAN IN VIOLATION OF PENNSYLVANIA'S FIREARM PREEMPTION STATUTE.

The Bump Stock Ban is the latest development in the sordid saga of the City's refusal to comply with the General Assembly's preemption of local gun laws:

> No county, municipality or township may in any manner regulate the lawful ownership, possession, transfer or transportation of guns, ammunition or ammunition components when carried or transported for purposes not prohibited by the laws of this Commonwealth.

18 Pa. Cons. Stat. § 6120 (a)

The Pennsylvania Supreme Court has substantively construed Section 6120 (a) in only a single case: *Ortiz. v. Commonwealth*, 681 A.2d 152 (Pa. 1996). However, that case alone demonstrates that Plaintiffs are likely to succeed in their challenge to the Bump Stock Ban.

The City had enacted an ordinance that: (1) banned "certain types of assault weapons"; and (2) banned certain "devices" and "accessories" that had, in City Council's view, "created special problems for local law enforce-

ment."[1] *Ortiz. v. Commonwealth*, 655 A.2d 194, 195 (Pa. Commw. Ct. 1996). Various Philadelphia politicians and others sued the Commonwealth, seeking an order either that the City's ordinance was not preempted or that Section 6120 (a) was itself illegal. *Ortiz*, 681 A.2d at 154. The Commonwealth Court, sitting in its original jurisdiction, dismissed the City's case. *Id*.

The Pennsylvania Supreme Court found that Section 6120 (a) preempted the City's ordinance in full, including both the prohibition of certain guns and also the ban on certain associated "devices" and "accessories." To the Court, so finding necessitated only a short, single paragraph of analysis: "the General Assembly has denied all municipalities the power to regulate the

---

[1]    *Ortiz* does not quote the definition of the banned items.  Attached as Exhibit A is a copy of the 1993 ordinance at issue obtained from the City of Philadelphia's official 1993 Ordinance book.

The prohibited "devices" and "accessories" included any "large capacity magazine, large capacity ammunition belt, gun silencer, expanding type conical bullet available in handgun chamberings, or other … device, accessory or ammunition[] designed or intended to cause injury or death to persons or damage to property for which no common lawful purpose exists."

The prohibited assault weapons were: (a) a specific list of guns, such as the AR-15; (b) "[a] semi-automatic shotgun with either a magazine capacity exceeding six rounds, a pistol grip, or a folding stock"; and (c) "[a] semi-automatic rifle or gun with a magazine capacity exceeding ten (10) rounds."

ownership, possession, transfer or possession of guns." *Ortiz*, 681 A.2d at 155.[2] The "inescapable conclusion" was therefore that the law was illegal in its entirety. *Id*. at 155.

Under *Ortiz*, the inescapable conclusion is that Section 6120 (a) pre-empts the Bump Stock Ban. The Bump Stock Ban prohibits possessing any "device" "that is designed to accelerate the rate of fire of a semi-automatic gun". The only two ROF Devices that the Bump Stock Ban enumerates are

---

[2]   While the *Ortiz* Court decided the case on the limits of a municipalities' power under Consitutitional Home Rule, it further specifically recognized Section 6120 (a) was enacted to protect the constitutional right to bear arms:

> Because the ownership of firearms is constitutionally protected, its regulation is a matter of statewide concern. The constitution does not provide that the right to bear arms shall not be questioned in any part of the commonwealth except Philadelphia and Pittsburgh, where it may be abridged at will, but that it shall not be questioned in any part of the commonwealth. Thus, regulation of firearms is a matter of concern in all of Pennsylvania, not merely in Philadelphia and Pittsburgh, and the General Assembly, not city councils, is the proper forum for the imposition of such regulation.
>
> *Ortiz*, 681 A.2d at 156

bump stocks and auto sears.[3] However, bump stocks, auto sears, and firearms incorporating them are lawful and so any ordinance regulating them is pre-empted.

Specifically, there is no federal or Pennsylvania law prohibiting bump stocks. The United States Supreme Court recently invalidated the only federal provision that applied specifically to bump stocks. *Garland v. Cargill*, *No.* 22-976, 602 U.S. ____ (2024), *available at* t.ly/_o90k. An auto sear is lawful under federal law so long as it is owned in compliance with NFA.[4]

---

[3]   As discussed in Plaintiffs' void for vagueness argument (section #2 *infra*), it is unclear what other ROF Devices might also be banned. Insofar as Plaintiffs can guess at what devices might be also banned, they are aware of no federal or state law that prohibits any other potential types of ROF Devices.

[4]   Ownership of auto-sears is legal under federal law, so long as they are owned in compliance with the NFA. *See* 26 U.S.C. § 5861 (permitting possession of a machinegun such as an auto-sear subject to NFA requirements not relevant here); 18 U.S.C. § 922 (o) (exempting machineguns lawfully possessed prior to specific date from general prohibition). Pennsylvania's Uniform Firearms Act incorporates the NFA's requirements by reference, permitting any persons to possess an "Offensive weapon" if their possession complies with the NFA. 18 PA. CONS. STAT. § 908 (b) (1) & (c). Plaintiff Gilson lawfully owns his auto-sear in compliance with the NFA. Cmplt. at ¶ 15.

Under Pennsylvania law, ownership of an auto sear in compliance with the NFA is legal. 18 PA. CONS. STAT. § 908 (b) (1). No Pennsylvania law of which Plaintiffs are aware governs bump stocks. The only related statute is Pennsylvania's prohibition of certain "offensive" weapons. *Id*. Bump stocks are not "offensive weapons." *See id*. (defining "Offensive weapons").

The Bump Stock Ban therefore squarely purports to regulate lawful ownership of guns within the meaning of *Ortiz*'s interpretation of Section 6120 (a). *Ortiz* makes clear that any effort to regulate guns themselves or associated "devices" or "accessories" is preempted, making the Bump Stock Ban's illegality plain.

Plaintiffs cannot fathom why the City fails to understand that and instead enacted the Bump Stock Ban. However, the City's troubling conduct following *Ortiz*—leading the Commonwealth Court to condemn the City for ignoring the law and instead acting in "bad faith and harassment" of innocent Philadelphians—might suggest an answer.

Following *Ortiz*, the City would pass ordinance after ordinance trying to nibble away at *Ortiz*. In response, the Commonwealth Court has struck down every single City ordinance even touching on lawful gun ownership or possession. That caselaw, while merely persuasive as the rulings of an intermediate state appellate court, makes the Bump Stock Ban's illegality even more clear.

9

In *Clarke v. Penn. House of Representatives*, the court rejected two Philadelphia Councilpersons' claim that the City should be allowed to pass a laundry list of gun legislation, which: (1) limited handgun purchases to one per month and prohibited straw purchases and sales; (2) mandated the reporting of lost or stolen guns; (3) required a license to purchase guns; (4) required an annual gun license; (5) provided for gun-confiscation of persons posing a risk of harm to others; (6) banned assault weapons again; and (7) required the reporting of the purchase of ammunition. 957 A.2d 361, 362 (Pa. Commw. Ct. 2008). The Commonwealth Court found that every single one of these ordinances was preempted under Section 6120 (a), even though many of them regulate only conduct surrounding firearm ownership and not the literal gun itself. *Clarke*, 957 A.2d at 364-65. Accordingly, the court found that the Councilpersons' efforts to secure a declaration that these ordinances were not preempted was facially meritless. *Id*.; *see also Schneck v. City of Philadelphia*, 383 A.2d 227, 228-30 (Pa. Commw. Ct. 1978) (invalidating a City ordinance regulating the acquisition and transfer of firearms).

In *National Rifle Ass'n v. City of Philadelphia*, the court invalidated a Philadelphia ordinance: (1) banning assault weapons again; and (2) prohibiting the "straw purchase" of guns. 977 A.2d 78 (Pa. Commw. Ct. 2009). The first issue was trivial under *Ortiz*, which had already invalidated the City's prior assault-weapons ban. *Id*. at 82. As to straw purchases, the Common-

wealth Court interpreted *Ortiz* to preclude even potentially illegal activity associated with gun ownership. *Id*. at 82-83. Instead, Section 6120 (a) committed any effort to regulate gun ownership solely to the General Assembly. *Id*. (quoting *Ortiz*, 681 A.2d at 156).

In *Armstrong*, the court invalidated a Philadelphia ordinance requiring guns owners to report the theft of their guns to police. 271 A.3d at 558. The case concerned the City's effort to seek a $ 2,000 fine from someone who failed to do so. *Id*. The merits were easy under *Clarke*, which had already declared such an ordinance illegal. *Id*. at 561.

Fighting against the obvious reality that its ordinance was indefensible, the City also raised the concerning claim that it did not matter whether the ordinance was illegal. To the City, since the ordinance was nonetheless a good idea, no court could enjoin its enforcement as a matter of the "balance of harms." *Id*. at 565. In a cruel Catch-22, the City also argued that Armstrong had violated the ordinance and so had "unclean hands" precluding him from challenging its validity. *Id*. The City quite literally claimed that it could fine someone—or even imprison someone, since the law also carried criminal penalties that the City chose not to seek—under an illegal law and no court could do anything about it.

11

Troubled, the Commonwealth Court rejected the City's open defiance of the rule of law. The law was illegal and that was all that mattered. *Id*. at 555-56. "[The City] reasonably should have known" that the ordinance was unenforceable. *Id*. at 568 The Court went on:

> Nonetheless, the City pursued this prosecutorial action against [Armstrong], without making any kind of notable linguistic change to the law it seeks to enforce and was struck down as preempted in *Clarke*. Also, the City does not make any meaningful argument for a change in the current state of the case law, **opting instead to essentially ignore the precedential authority of this Court as if it does not exist.**
>
> *Armstrong*, 271 A.3d at 568 (emphasis added)

Finally, the Court found that the City's "incredibl[e]" arguments were "a form of bad faith and harassment on the part of the City." *Id*.

In cases not involving the City itself, the Commonwealth Court has also consistently invalidated anything to do with lawful gun ownership or possession. In *Dillon v. City of Erie*, it prohibited enforcement of an ordinance banning the carrying of guns in Erie parks. 83 A.3d 467, 473 (Pa. Commw. Ct. 2014); *see also Firearms Owners Against Crime v. Lower Merion Twp.*, 151 A.3d 1172 (Pa. Commw. Ct. 2016) (same). Similarly, in *Firearms Owners Against Crime v. City of Pittsburgh*, the court among other things found that Pittsburgh could not prohibit the discharge of guns in public because the "General Assembly has assumed sole regulatory power." 276 A.3d 878, 892 (Pa.

12

Commw. Ct. 2022). The court noted that Section 6120 (a) has a scope "transcending the simple acts of 'ownership, possession, transfer or transportation"—the provision's actual text. *Id*.

In contrast, the Commonwealth Court has upheld ordinances against a Section 6120 (a) challenge in only three circumstances: (1) the manufacture of "ghost guns," *Gun Owners of America v. Philadelphia*, 311 A.3d 72, 83–84 (Pa. Commw. Ct. 2024); (2) the zoning of gun shops, since Pennsylvania law finds that preemption provisions ordinarily do not apply to zoning absent specific language to that effect, *The Gun Range, LLC v. City of Philadelphia*, *No.* 1529 C.D. 2016, 2018 WL 2090303 at *5-6 (Pa. Commw. Ct. May 7, 2018) (unreported); and (3) the prohibition of gun possession in court because the ordinance applied solely to gun possession that state law made illegal, *Minich v. County of Jefferson*, 869 A.2d 1141, 1144 (Pa. Commw. Ct. 2005). None of these circumstances are at issue here.

Under this litany of cases, the Bump Stock Ban is just the latest in a series of willfully defiant refusals of the City to follow Section 6120 (a). Not satisfied with the harsh rebuke that it received from the Commonwealth Court in *Armstrong* for trying to prosecute an innocent Philadelphian in violation of Section 6120 (a), the City tries yet again to enact a law with substantial civil and criminal penalties regulating gun ownership. This Court should not tol-

13

erate the City's ongoing attempts to flaunt settled Pennsylvania law despite the courts' repeated admonishment it cannot do so. This Court should tell the City what the Commonwealth Court did in *Armstrong*—stop it.

2. **THE BUMP STOCK BAN IS UNCONSTITUTIONALLY VAGUE, LEAVING THE PUBLIC TO GUESS AT WHAT IS PROHIBITED AND WHAT MIGHT BE PERMITTED.**

It is well-settled that any law or regulation is unconstitutional if it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *See, e.g., Connally v. General Construction Co.*, 269 U.S. 385, 385 (1926). Subsequently, the Supreme Court further explained:

> It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute abuts upon sensitive areas of basic [constitutional] freedoms, it operates to inhibit the exercise of those freedoms. Uncer-

> tain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked."
>
> *Grayned v. City of Rockford*, 408 U.S. 104, 108–109 (1972) (quotation and alteration marks omitted)

The Bump Stock Ban prohibits all ROF Devices, defined as "[a] device, such as an auto sear or bump stock, that is designed to accelerate the rate of fire of a semi-automatic firearm." This definition is insufficient to provide fair notice of what is prohibited or allowed by the law, and therefore Plaintiffs are likely to succeed in their vagueness challenge to the Bump Stock Ban.

The bill provides two examples of prohibited devices. However one of the two examples in inapt, and the other is undefined. Finally, the statute's operative definition is effectively meaningless.

Next, the lack of any clear standards or definitions creates the necessity that every potential device will be arbitrarily and subjectively enforced on an *ad hoc* basis. A law is not constitutional absent explicit and objective standards to ensure its fair application.

Finally, the application of the law will be necessarily discriminatory, as the Bump Stock Ban prohibits devices that are lawfully possessed and officially issued to the Philadelphia Police Department, federal law enforcement, and National Guard, but fails to provide any carve-outs for these users.

Despite its universal prohibition on these devices, the law will not be enforced against these favored groups, but instead will only selectively enforced against those disfavored by the City.

In short, no one—*including the City of Philadelphia itself*—has any reasonable idea as to what the Bump Stock Ban prohibits or permits. The law provides no possibility of 'fair warning' with 'explicit standards' for unlawful conduct, and therefore must result in *ad hoc*, arbitrary and discriminatory enforcement that is prohibited by our Constitution.

2.1.  **The City's inclusion of 'auto-sear' as an enumerated example of a rate-of-fire acceleration device creates confusion, not clarity.** The City enumerates two examples to help understand what the Bump Stock Ban prohibits. However, one of the examples—an 'auto-sear'—cannot be a prohibited device, because it cannot meet the definition provided.

An 'auto sear' is a component of a *fully-automatic* firearm, meaning, by definition, more than one bullet can be fired by a single pull of the trigger.

A semi-automatic firearm, by definition, can fire one bullet for each pull of the trigger, and cannot fire more than one bullet per trigger pull. A weapon can be either semi-automatic or fully-automatic, however **it cannot be both.**

As a result, the City's definition of a 'Rate-of-fire acceleration device' as a device "designed to accelerate the rate of fire of a **semi-automatic firearm**" cannot apply to an auto-sear. Auto-sears cannot be installed in semi-automatic firearms; the modification required to install an auto-sear makes the firearm *fully automatic*.

**2.2.    The inclusion of 'bump stock' is neither defined nor adequately explained.**

There is no commonly accepted definition for bump stock. Rather, it is an ambiguous term that can be used to apply to many devices that operate in many different ways, that attempt to facilitate the *legal* technique of 'bump-firing' a semi-automatic firearm.

The Supreme Court recently explained this technique in *Cargill*:

> Shooters have devised techniques for firing semiautomatic firearms at rates approaching those of some machineguns. One technique is called bump firing. A shooter who bump fires a rifle uses the firearm's recoil to help rapidly manipulate the trigger. The shooter allows the recoil from one shot to push the whole firearm backward. As the rifle slides back and away from the shooter's stationary trigger finger, the trigger is released and reset for the next shot. Simultaneously, the shooter uses his nontrigger hand to maintain forward pressure on the rifle's front grip. The forward pressure counteracts the recoil and causes the firearm (and thus the trigger) to move forward and "bump" into the shooter's trigger finger. This bump reengages the trigger and causes another shot to fire, and so on.

> Bump firing is a balancing act. The shooter must maintain enough forward pressure to ensure that he will bump the trigger with sufficient force to engage it. But, if the shooter applies too much forward pressure, the rifle will not slide back far enough to allow the trigger to reset. The right balance produces a reciprocating motion that permits the shooter to repeatedly engage and release the trigger in rapid succession.

> *Garland v. Cargill*, *No.* 22-976, 602 U.S. ____ at *2 (2024), *available at* `t.ly/_o9Ok`

The bump-firing technique does not require any additional equipment. *E.g.* Eatallthebirds, *How to Bump Fire an AR-15/M4*, YouTube (July 10, 2016), *available at* `t.ly/303qP`. However, normal items—such as a rubber-band or belt loop of pants—can also be used to facilitate this technique. *E.g.* Cody Baker, *The AR-15 Belt Loop Trick*, YouTube (Feb. 6, 2019), *available at* `t.ly/LAdpU`. There is no prohibition on 'bump-firing' a weapon. It is completely legal to do.

However, there are devices that can assist with bump-firing, which the BATF recently attempted to regulate.[5] There, the BATF sought to regulate devices that could aid in bump-firing. It did so by re-defining the term 'machinegun' to include: "a bump-stock-type device, *i.e.*, a device that allows a semi-automatic firearm to shoot more than one shot with a single pull of

---

[5]   The BATF bump stock regulation was struck by the Supreme Court in *Garland v. Cargill* on grounds not relevant here. *No. 22-976*, ____ U.S. ____ (Jun 14, 2024).

the trigger by harnessing the recoil energy of the semi-automatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter." *No. 22-976*, ____ U.S. ____, *5 ( Jun 14, 2024).  The Supreme Court expressly rejected this re-definition, as the BATF's definition was incompatible with the statutory definition of 'machinegun'. *Id*. at *6. Notwithstanding whether a 'bump-stock' could be a 'machinegun', the Supreme Court also noted that the BATF's description was incorrect, specifically rejecting both that 'bump-firing' "allowed more than one shot per single pull of the trigger" and illustrating the function of a trigger with technical drawings. *Id*. at *7-14.

Perhaps recognizing the difficulty in defining the term 'bump-stock', the City provides no definition or explanation of the term.  However, it not only fails to define or describe what a 'bump-stock' is, but it attempts to use the *undefined* term as an example to illustrate what it claims a ROF Device is.

Apparently, despite the difficulties that the BATF—our nation's preeminent firearms law enforcement agency—had in defining a 'bump stock' for our Supreme Court, every person in Philadelphia is just supposed to know what a bump stock is.  However, this type of 'I'll know it when I see it' is not constitutionally adequate to support civil or criminal penalties.

19

**2.3.**     **The City's definition invites arbitrary interpretation as the terms used are meaningless in context.** The operative language of the Bump Stock Ban is "device … designed to accelerate the rate of fire of a semi-automatic firearm." However, the use of the undefined phase 'rate of fire' renders this definition nearly meaningless.

For fully-automatic firearms, the term 'rate of fire' is used to describe the cyclical speed of the weapon. Cyclical speed means how fast the firearm 'cycles' or how quickly a gun is ready to fire again after firing, and is usually expressed in rounds/minute. For example, the rate of fire of archetypal military rifle, the 'M16A3' is 800 rounds/minute, meaning for every second the trigger is held, the firearm will shoot approximately 13 bullets. Gordon L. Rottman, *The M16*, 14 (Osprey Publishing, 2011) (20 December 2011). The rate of fire is a mechanical limitation of a fully-automatic firearm, either by design (to ensure safe sustained operation while firing fully-automatic) or because the physical mechanism that allows the gun can not actually cycle faster.

For semi-automatic firearms, the term 'rate of fire' is nearly meaningless. If the term 'rate of fire' were applied to a semi-automatic firearm, it should be used to describe the maximum mechanical speed that the firearm could physically cycle. The rate of fire of a semi-automatic weapon can not be meaningfully changed without mechanical modification to the firearm.

It should not be connected to the speed at which a semi-automatic weapon is being fired because a semi-automatic weapon fires as quickly or slowly as the person pulls the trigger.  Therefore, it cannot be a useful measure:  the speed of firing a semi-automatic weapon is regulated entirely by the person pulling the trigger.

As a result, the City could arbitrarily determine many other devices are ROF Devices, and "designed to accelerate the rate of fire of a semi-automatic firearm."  For example, most semi-automatic firearms allow for an aftermarket trigger system to be installed.  Most aftermarket triggers require less pressure for the trigger to operate—meaning the trigger is easier, and therefore faster, to pull.  These triggers are *designed* to allow the user of that firearm to more quickly and accurately shoot the weapon.  It is therefore possible that the City's Bump Stock Ban just prohibited any person from possessing an aftermarket trigger for their firearm.

Similarly, a rifle foregrip is designed to allow a person to shoot faster by allowing better control of the recoil of a weapon.  Foregrips are also a device that can be used to 'bump-fire' a rifle, by allowing for controlled, consistent forward pressure on the weapon, which the user could harness to allow recoil to bump the trigger against the user's finger.  It would be no leap of imagination to think the City would wish to prohibit foregrips, as the City previously attempted to ban similar devices, which was rejected by the Pennsyl-

vania Supreme Court in the *Ortiz* case. However, a foregrip could easily be construed as a ROF device, and any person in possession of one may now arbitrarily be in violation of the Bump Stock Ban.

Ultimately, there is no way any person could actually know if any particular 'device' is prohibited or permitted within the City of Philadelphia, instead they 'must necessarily guess'. The definition provided by the City is wholly arbitrary and self-referential; effectively, it attempts to define a ROF Device as a 'bump stock', and a 'bump stock' as a ROF Device, without providing fair notice of either.

2.4.    **Enforcement of the Bump Stock Ban will be entirely arbitrary, with the City selectively 'picking and choosing' who is subject to the ban and who is not.** No law may invite arbitrary and discriminatory enforcement, and therefore every law must "provide explicit standards for those who apply them." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972). This inherently includes knowing who might be exempt from the law.

The Bump Stock Ban is an absolute prohibition on the possession of rate-of-fire acceleration devices, including auto-sears. **There are no carve-outs for government users.** However, a multitude of agencies possess now-prohibited devices, including the Philadelphia Police, BATF, FBI, Secret Service, and many other federal law enforcement agencies in the City. Anna Orso, *Philly's bump stock ban faces a lawsuit just days after it was signed into law*,

22

PHILADELPHIA INQUIRER, Jun 21, 2024, *available at*, `t.ly/qKu4V`
(Philadelphia Police commenting "SWAT rifles include a [now prohibited]
part called an 'auto sear' that allows for fully-automatic firing").  None of
these agencies are exempt from the City's prohibition on auto-sears.

It is inconceivable that the City will enforce the Bump Stock Ban on any
of these agencies.  The Philadelphia Police Department is not going to arrest
its SWAT officers for possessing an issued rifle with an auto-sear. Yet that is
exactly what the law requires.

It is fundamentally arbitrary and discriminatory to enforce the law on
some disfavored groups while refusing to enforce it on other favored groups.
But that is exactly what is going to happen here: The City will selectively and
arbitrarily enforce the law on an *ad hoc* basis.  Those disfavored by the City
will be selectively charged, and those favored will be selectively ignored.

As a result, the Bump Stock Ban is unconstitutionally vague.

3.   **THE BUMP STOCK BAN IS AN AHISTORIC AND UN-CONSTITUTIONAL PROHIBITION OF ARMS THAT ARE PROTECTED BY THE UNITED STATES AND PENNSYLVANIA CONSTITUTIONS.**

Both the Second Amendment and its Pennsylvania analogue both protect similar conduct: the right to bear arms. *See* U.S. Const. amend. II, Pa. Const. art. I, § 21. The Supreme Court has adopted a presumptive constitutional protection for all conduct that falls within the plain text of the Second Amendment. *Bruen*, 597 U.S. at 22-24.

Restrictions are permitted only in "exceptional circumstances" where those restrictions have a historical analogue. *Id*. at 38. "The government must affirmatively prove that is firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 19. In the Third Circuit, the relevant historical tradition (period) is the adoption of the Second Amendment, "which should be understood according to its public meaning in 1791." *Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 134 n. 14 (3d Cir. 2024).

As a result, it is **entirely the government's burden** to show the constitutionality of any laws it seeks to promulgate. For any new regulation to be constitutional, the government "must identify a well-established and representative historical analogue." *Bruen*, 597 U.S. at 30. However, courts "should not 'uphold every modern law that remotely resembles a historical analogue,'

because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.'" *Id*. (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021)) (alterations in original).

However, while regulations must have a historical analogue, the definition of arms "does not apply only [to] those arms in existence in the 18th century'" but—similar to the First Amendment—has evolved with time. *Bruen*, 597 U.S. at 28; *see also United States v. Rahimi*, *No. 22-915*, ____ U.S. ____, *7 (Jun 21, 2024), *available at* t.ly/qClOY (noting Second Amendment applies to more than "muskets and sabers").

Here, the City is plainly prohibiting conduct protected by the Second Amendment: the possession of firearms with certain characteristics (*i.e.* bump stocks). Therefore in support of any regulation, the City must show a historical analogue. However, there is no relevant founding-era historical analogue to the City's 'Bump Stock Ban'.

Therefore, the City's Bump Stock Ban must be unconstitutional under both the Second Amendment and Pennsylvania's Article I, Section 21.

*Preliminary Injunction Factors*

**4.**   **PLAINTIFFS HAVE– AND WILL– SUFFER IRREPARA-BLE HARM AS A RESULT OF THE ILLEGAL AND UN-CONSTITUTIONAL BUMP STOCK BAN ABSENT PRE-LIMINARY INJUNCTIVE RELIEF.**

Plaintiffs will irreparably suffer harm under the City's Bump Stock Ban for at least three reasons. First, it is well-accepted that constitutional violations constitute irreparable harm. Second, the threat of criminal prosecution is also irreparable harm. Third, it is well-established in Pennsylvania that municipal laws in violation of state preemption is irreparable harm.

**4.1.**   **Deprivations of constitutional violations "even for minimal periods of time, unquestionably constitute irreparable injury."** *See Elrod v. Burns*, 427 U.S. 347, 373 (1976 ). While this principle is well-settled in the First Amendment context, its application to the Second Amendment should be no less certain. *See Bruen*, 597 U.S. at 2156 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010)) ("The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'"); *accord United States v. Marzzarella*, 614 F.3d 85, 89 n. 4 (3d Cir. 2009) ("[W]e look to other constitutional areas for guidance in evaluating Second Amendment challenges. We think the First Amendment is the natural choice.").

26

In the First Amendment context, it is well-established that the threat of criminal prosecution for the exercise of constitutional rights is irreparable harm. *Dombrowski v. Pfister*, 380 U.S. 479, 485-87 (1965). That a person may successfully defend against a prosecution is not an "adequate vindication of constitutional rights" nor must a person "risk prosecution to test their rights." *Id*. at 485–86. This is because the "chilling effect upon the exercise of [constitutional] rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure." *Id*. at 487.

The Bump Stock Ban violates both the United States– and Pennsylvania– Constitutions as well as Pennsylvania's firearms preemption law enacted to protect those same constitutional rights. The Bump Stock Ban also threatens civil and criminal penalties for exercising those same constitutional right, including a potentially unknown length of imprisonment—depending on how many devices the City arbitrarily devices violate the Bump Stock Ban that are found on the *first offense*. Therefore, the Bump Stock Ban constitutes irreparable harm.

**4.2. The exposure to criminal penalties is also independent irreparable harm.**

"Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Grayned*, 408 U.S. at 109. It is impossible to comply with a vague law, however the threat of criminal prosecution for that law is no less real.

Here, the City has enacted a law that carries civil and criminal penalties with enhanced violations for repeat offenses. However, a repeat offense may be stacked *on the very first offense* if a person is found with multiple illegal items.

The law may be unconstitutional, and illegal under controlling Pennsylvania law, but that unconstitutionally and illegality does not stop the City from enforcing the law, seizing firearms, and jailing the citizens, before forcing them to defend themselves against this unlawful infringement.

Theoretically, were the City to find any person in possession of six devices that the City—it its sole arbitrary discretion—determines are ROF Devices, it could impose more than a year's imprisonment *for the first offense*. Plaintiffs do not know how many potential ROF Devices the City might arbitrarily decide are in their possession because it is impossible to know based upon the text of the statute.

This places Plaintiffs in the Hobbesian choice of ignoring a law they believe illegal or facing an unknown potential prison sentence. This is worsened by the fact that Plaintiffs do not know how to comply with the law, nor could they be sure if they are complying unless they dispossess themselves of every potential firearm and device that could conceivably be construed as a prohibited ROF Device.

The harm of being illegal jailed and charged for legal and protected behavior must be considered to be irreparable, particularly when it is impossible to know how to comply with the law.

4.3.   **It is long-settled Pennsylvania law that violation of a state statute constitutes irreparable harm.**   As discussed above, this is the latest chapter in the City's attempt to pass illegal firearms regulation despite repeated admonishments from our courts.  Pennsylvania law denies municipalities any interest in violating state law but instead demands obedience to the General Assembly's enactments. *Pennsylvania Public Utility Commission v. Israel*, 52 A.2d 317, 321 (Pa. 1947) ("The argument that a violation of law can be a benefit to the public is without merit.  When the Legislature declares certain conduct to be unlawful it is tantamount in law to calling it injurious to the public.  For one to continue such unlawful conduct constitutes irreparable injury."), *SEIU Healthcare Penn. v. Commonwealth*, 104 A.3d 495, 508–509 (Pa. 2014) (same). Further, the Pennsylvania Commonwealth Court has explicitly held that Philadelphia's previous violations of Section 6120 (a) is ir-

29

reparable harm. *Armstrong*, 271 A.3d at 565;[6] *see also Dillon*, 83 A.3d at 472 (*en banc*) (enactment of ordinance preempted by state statute is *per se* irreparable harm); *Lower Merion Twp.*, 151 A.3d at 1180 (same).

As there can be no doubt that the City is violating Pennsylvania Section 6120 (a), which was enacted to protect citizen's constitutional right to bear arms, and further that the City has thoroughly litigated both state preemption and the question of irreparable harm in other cases, this Court should also find that the Bump Stock Ban also constitutes irreparable harm due to Pennsylvania's firearm preemption statute.

5.   **THE BALANCE OF HARMS CANNOT TIP IN FAVOR OF A GOVERNMENT'S VIOLATION OF CONSTITUTIONAL RIGHTS OR FIREARMS PREEMPTION.**

Once the movant satisfies both likelihood of success and irreparable harm, the Court must measure the remaining two factors: harm to the parties and the public interest. However, as "the government is the opposing party, the latter two factors merge" and the Court need only consider the public interest. *Schrader v. Dist. Attorney of York Cnty.*, 74 F.4th 120, 126 (3d Cir. 2023).

---

[6]   The *Armstrong* opinion and the City's unreasonable arguments therein are more fully discussed in Plaintiffs' discussion of state firearms preemption (Section, #1 *supra*). The cases is cited not only for its persuasive value as an opinion of Pennsylvania's intermediate court of appeal, but also as this Court may consider the issue settled by virtue of issue preclusion.

"[I]f a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017). Further, it has been well-settled, "the enforcement of an unconstitutional law vindicates no public interest." *K.A. ex rel. Ayers v. Pocono Mt. Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013).

Further, Pennsylvania law denies municipalities any interest in violating state law: "[T]he balance of harms will always weigh in favor of the individual when the individual seeks to enjoin a municipal ordinance and/or law that is preempted by Section 6120 (a)." *Armstrong*, 271 A.3d at 565 (discussing *Lower Merion Twp.*, 151 A.3d 1172); *See also SEIU Healthcare*, 104 A.3d at 596 (unlawful behavior—even by government—is always injurious to public).

Ultimately, the City's interest—whatever it might be—is wholly irrelevant, as are any 'harms' that it might claim. The interest of the government cannot be differ from the public interest. Firearms preemption was enacted to protect our constitutional right to bear arms. There can be no public interest in the City violating state law, nor any interest in the government violating the constitutional rights of its citizens. Therefore, the balance of harms must be exclusively in the Plaintiffs' favor, as there is nothing left to balance.

# CONCLUSION

There is no legitimate basis for the City to have passed its Bump Stock Ban. There is no doubt it is preempted under Pennsylvania law. It is unconstitutionally vague. It is an infringement of the Second Amendment and Article I, Section 21 of the Pennsylvania Constitution.

Therefore, Plaintiffs respectfully request this Court enter the attached proposed Order, enjoining enforcement of the City's Bump Stock Ban.

Respectfully Submitted,

**Andrew B. Austin**, Esq.
Pennsylvania Bar # 323768
P.O. Box # 54628
Philadelphia, Pennsylvania, 19148
+1 (610) 656-1956
austin@replev.in

**AUERBACH PLLC**
Daniel J. Auerbach (I.D. No. 316856)
241 South 6th Street, # 1902B
Philadelphia, PA 19106
(215) 983-6966
dan@auerbach.llc

*Attorneys for Plaintiffs*

785

(.27)  *Ruger K-Mini-14/5F and Mini-14/5RF;*

(.28)  *SIG AMT, SIG 550SP, SIG551SP, SIGPE-57 types;*

(.29)  *SKS with detachable magazine type;*

(.30)  *Spectre Auto carbine type;*

(.31)  *Springfield Armory BM59 and SAR-48 type;*

(.32)  *Steyr A.U.G. semi-automatic type shotgun;*

(.33)  *Uzi type semi-automatic firearms;*

(.34)  *USAS 12 semi-automatic type shotgun;*

(.35)  *Valmet M62, M71S, M76, or M78 type semi-automatic weapons;*

(.36)  *Weaver Arm Nighthawk;*

(.37)  *A semi-automatic shotgun with either a magazine capacity exceeding six rounds, a pistol grip, or a folding stock;*

(.38)  *A semi-automatic rifle or gun with a magazine capacity exceeding ten (10) rounds;*

(.39)  *A part or combination of parts designed or intended to convert a firearm into an assault weapon, or any combination of parts from which an assault weapon may be readily assembled if those parts are in the possession or under the control of the same person.*

(b) Contraband Weapons, *Accessories and/or Ammunition.* Any *assault weapon,* bazooka, recoilless rifle, grenade, rifle grenade launcher, anti-tank gun, flame-thrower, rocket, mortar, bomb, mine, bobby trap,